UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

In re

DANA CORPORATION, *et al.,*

                                    Debtors.

-------------------------------------------------------------x

07-CV-05995  (PAC)

Chapter 11
Case No. 06-10354 (BRL)
(Jointly Administered)

APPELLANT'S BRIEF
ON BEHALF OF BERLIN METALS LLC
ON APPEAL OF
ORDER VALUING RECLAMATION CLAIMS AT ZERO

TORRE, LENTZ, GAMELL, GARY
& RITTMASTER, LLP
*Attorneys for Appellant Berlin Metals LLC
(for itself and for its assignee and
transferee JPMorgan Chase Bank, N.A.)*
100 Jericho Quadrangle, Suite 309
Jericho, New York 11753-2702
Telephone:  (516) 240-8900
Fax:  (516) 240-8950
Robert Beau Leonard (RL-4010)

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

**STATEMENT OF BASIS FOR APPELLATE JURISDICTION** . . . . . . . . . . . . .  1

**ISSUES PRESENTED AND STANDARD OF APPELLATE REVIEW** . . . . . . .  1

**STATEMENT OF THE CASE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

**ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

**POINT I:**      **BERLIN'S CLAIM SHOULD BE VALUED AT $392,077.91** . . . . .  7

**POINT II:**    **NO PRIOR LIEN DEFENSE EXISTS AS TO REINZ LLC** . . . . . .  11

**POINT III:**  **THE DEBTORS HAD NO POWER TO CONVEY
A SECURITY INTEREST TO THE DIP LENDERS** . . . . . . . . . . .  13

                    **The 2005 BAPCPA Amendments** . . . . . . . . . . . . . . . . . . . . . . .  16

                    **Comparison with State Law** . . . . . . . . . . . . . . . . . . . . . . . . . .  19

                    **Comparison with the Secured Lenders' Rights** . . . . . . . . . . . .  20

**POINT IV:** **THE DIP LENDERS DID NOT GET PRIORITY OVER BERLIN**  27

**POINT V:**   **THE DIP LENDERS DID NOT ACQUIRE THE OLD LIENS** . . . .  31

                    **Public Policy Supports Berlin's Position**. . . . . . . . . . . . . . . . .  37

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

# TABLE OF AUTHORITIES

**Cases:**

*Aquilino v. U.S.*, 363 U.S. 509, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960) ............................ 25

*Barnett Bank of Marion County, N. A. v. Nelson*, 517 U.S. 25 (1996) ............................ 23

*Erlenbaugh v. U.S.*, 409 U.S. 239, 243-244 (1972) ............................................. 25

*F.D.I.C. v. Four Star Holding Co.*, 178 F.3d 97 (2d Cir. 1999) ........................................ 29

*Griffin Retreading Co. v. Oliver Rubber Co.* (*In re Griffin Retreading Co.*),
795 F.2d 676, 680 (8th Cir. 1986) ............................................................. 26

*In re 139-141 Owners Corp.*, 313 B.R. 364, 367 (S.D.N.Y. 2004) .................................... 3

*In re Adelphia Communications Corp.*, 325 B.R. 89, 112-113
(Bankr.S.D.N.Y. 2005), *affirmed in part and reversed in part
on other grounds*, 331 B.R. 93 (S.D.N.Y. 2005) ................................................ 25

*In re Child World, Inc.*, 145 B.R. 5 (Bankr.S.D.N.Y. 1992) ............................................. 22

*In re Cody, Inc.,* 338 F.3d 89, 94 (2d Cir. 2004) ..................................................... 3

*In re Dairy Mart Convenience Stores, Inc.*, 302 B.R. 128 (Bankr.S.D.N.Y. 2003) ... 26, 33

*In re Dana Corporation*, 367 B.R. 409 (Bankr.S.D.N.Y. 2007) ......................................... 5

*In re Diversified Food Service Distributors, Inc.,* 130 B.R. 427
(Bankr.S.D.N.Y. 1991) ......................................................................... 26

*In re Flagstaff Foodservice Corp.*, 14 B.R. 462 (Bankr.S.D.N.Y.1981) .......................... 26

*In re Foust*, 52 F.3d 766, 768 (8th Cir. 1995) ........................................................ 3

*In re Georgetown Steel Company, LLC*, 318 B.R. 340 (Bankr.D.S.C. 2004) .................. 26

*In re Globe Store Acquisition Co., Inc.*, 178 B.R. 400 (Bankr.M.D.Pa., 1995) ............... 24

*In re Howard's Appliance Corp.*, 874 F.2d 88 (2d Cir. 1989) ......................................... 24

*In re Manville Forest Prods. Corp.*, 896 F.2d 1384, 1388 (2d Cir. 1990) ........................ 3

*In re Palm Coast, Matanza Shores Ltd. P'Ship,*
101 F.3d 253, 256 (2d Cir. 1996) ............................................................. 1

*In re Phar-Mor, Inc.*, 301 B.R. 482 (Bankr.N.D.Ohio 2003) ............................ 33

*In re Roberts Hardware Co.,* 103 B.R. 396, 398 (Bankr.N.D.N.Y. 1988) ...................... 26

*In re Trans World Airlines, Inc.,* 322 F.3d 283, 288-289 (3d Cir. 2003) ........................ 29

*In re UDI Corp.*, 301 B.R. 104 (Bankr.D.Mass. 2003) ........................................ 24

*In re Wheeling-Pittsburgh Steel Corp.*, 74 B.R. 656 (Bankr.W.D.Pa. 1987) ................. 22

*Kennett-Murray & Co. v. Pawnee Nat'l Bank*, 598 P.2d 274 (Okla. App. 1979) ............ 25

*Matter of Deephouse Equipment Co., Inc.*, 22 B.R. 255, 258 (Bankr.D.Conn. 1982) ..... 25

*Patterson* v. *Shumate*, 504 U. S. 753 (1992) ................................................ 24, 25

*Perrin* v. *United States*, 444 U.S. 37, 42 (1979) ........................................... 16-17

*Pester Refining Co. v. Ethyl Corp. (In re Pester Refining Corp.),*
964 F.2d 842, 845-46 (8th Cir. 1992) ...................................................... 22, 25-26

*United States Dep't of Treasury v. Fabe*, 508 U.S. 491 (1993) ............................... 23

*United States v. Lopez*, 514 U.S. 549 (1955) ................................................. 23

*United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948) ....................... 3

*United States v. Westside Bank,* 732 F.2d 1258, 1265 (5th Cir. 1984) ....................... 26

*Yonkers Bd. of Educ. v. Richmond Children's Center, Inc.*,
58 B.R. 980 (S.D.N.Y. 1986) ............................................................... 24

## Statutes & Court Rules:

11 U.S.C. (Bankruptcy Code) §361 ........................................ 6, 15, 27, 28, 30, 36
11 U.S.C. (Bankruptcy Code) §362 .................................................. 29, 30, 36
11 U.S.C. (Bankruptcy Code) §363 .............................................. 28, 29, 30, 36
11 U.S.C. (Bankruptcy Code) §364 ...................................... 6, 27, 28, 30, 31, 36

11 U.S.C. (Bankruptcy Code) §503(b) ................................................... 31

11 U.S.C. (Bankruptcy Code) §506 ................................................... 22, 28

11 U.S.C. (Bankruptcy Code) §507 ................................................... 30, 31

11 U.S.C. (Bankruptcy Code) §541 ................................................... 23, 24

11 U.S.C. (Bankruptcy Code) §544 ........................................................................ 15

11 U.S.C. (Bankruptcy Code) §545 ........................................................................ 15

11 U.S.C. (Bankruptcy Code) §546 ................................................................. passim
11 U.S.C. (Bankruptcy Code) §546(c) ............................................................ passim
11 U.S.C. (Bankruptcy Code) §546(c)(1) ....................................................... passim
11 U.S.C. (Bankruptcy Code) §546(h) ....................................................... 17, 18, 21
11 U.S.C. (Bankruptcy Code) §546(i) ..................................................... 17, 18, 21, 34
11 U.S.C. (Bankruptcy Code) §546(j) ................................................................ 18,

11 U.S.C. (Bankruptcy Code) §547 .......................................................... 15, 18, 20

11 U.S.C. (Bankruptcy Code) §549 ........................................................................ 15

28 U.S.C. §158(a) ....................................................................................................... 1

Bankruptcy Rule 4001 ...................................................................................... 5, 36

Bankruptcy Rule 8013 ............................................................................................. 3

Delaware General Corporation Code §259 .......................................................... 13
Delaware General Corporation Code §264 .......................................................... 13
Delaware General Corporation Code §266 .......................................................... 13

General Order No. M-274, Southern District Bankruptcy Court ............... 5, 14, 36

Local Bankruptcy Rule 4001-3 ......................................................................... 5, 36

Local Bankruptcy Rule 9014-2 ................................................................................ 3

New York Lien Law §§ 70-71 ................................................................................ 25

Pub. L. No. 109-8, 119 Stat. 23, §406 ..................................................................... 5
Pub. L. No. 109-8, 119 Stat. 23, §1227 ................................................................... 5

UCC 9-109(c) .......................................................................................................... 19
UCC 9-109(d) .......................................................................................................... 19
UCC 9-311(a) .......................................................................................................... 19
UCC 9-309 .............................................................................................................. 19
UCC 9-317(e) .......................................................................................................... 19
UCC 9-315 .............................................................................................................. 20

## Other Authorities:

The Federalist No. 42, at 287 (Madison, J.) ......................................................... 23

*The Powers of Courts of Equity. I. "In Rem" and "In Personam",*
Walter Wheeler Cook, *Columbia Law Review*, Vol. 15, No. 1 (Jan., 1915), pp. 37-54 ... 29

*Seller's Right to Reclaim Property Under Section 2-702(2) of the Code*
*Under the Bankruptcy Act: Fact or Fancy,* Weintraub & Edelman,
32 Bus.Law 1165, 1167 (1977) ........................................................................... 24

## STATEMENT OF BASIS FOR APPELLATE JURISDICTION

This is an appeal from a Bankruptcy Court order.  District courts have appellate

jurisdiction over Bankruptcy Court rulings, under 28 U.S.C. §158(a).  Final orders of the

Bankruptcy Court may be appealed to the district court as of right, under 28 U.S.C.

§158(a)(1).  A Bankruptcy Court order is final if "[n]othing in the order . . . indicates any

anticipation that the decision will be reconsidered."  *In re Palm Coast, Matanza Shores*

*Ltd. P'Ship,* 101 F.3d 253, 256 (2d Cir. 1996).  District courts also are empowered to hear

appeals from any interlocutory Bankruptcy Court order, under 28 U.S.C. §158(a)(3)(c).

On this appeal, Berlin Metals LLC ("Berlin") seeks reversal of the Bankruptcy

Court order that valued Berlin's reclamation claim at "zero", by reason of the Debtors'

"Prior Lien Defense".  Nothing in the order indicates that it will be reconsidered.  In any

event, the order should be reviewed in light of the important issues it raises — some of

which were decided incorrectly and some of which remain to be resolved.

## ISSUES PRESENTED AND STANDARD OF APPELLATE REVIEW

The issues presented on this appeal include the following:

1.      Is "zero" the proper value of Berlin's reclamation claim under

Bankruptcy Code §546(c), for goods sold within 21 to 45 days prior to the bankruptcy

filings?  ANSWER:  No.  Berlin's reclamation claim should be valued at $392,077.91.

2.      Were any goods sold by Berlin to Reinz Wisconsin Gasket LLC

("Reinz LLC"), instead of to Dana Corporation, covered by the pre-petition banks' UCC

security interest?  ANSWER:  No.  Reinz LLC did not exist at the time the pre-petition

UCC security interests were created. Also, the Debtors' own schedules of assets and liabilities filed in the Bankruptcy Court state that Reinz LLC has no secured liabilities, and had none on the Chapter 11 filing date. The Debtors' "Prior Lien Defense" to the Berlin reclamation claim should have been dismissed as to any goods sold to Reinz LLC (representing between 85% and 100% of the $392,077.91 at issue on Berlin's appeal, according to the Debtors' own allegations), regardless of any other issues presented.

3.    Under Bankruptcy Code §546(c), did the Debtors have the power to convey a security interest in the goods to the DIP Lenders, in violation of the reclamation rights of Berlin, as a seller? ANSWER: No. Bankruptcy Code §546(c) specifically limits the power of a trustee or a debtor in possession to use collateral that is subject to the reclamation rights of the seller who sold those goods to the debtor on credit.

4.    Did the DIP Lenders get a first priority lien that wiped out Berlin's reclamation rights? ANSWER: No. The Bankruptcy Court orders (a) preserved the rights of certain parties, using language which is broad enough to include Berlin, (b) prohibited Berlin and other reclamation claimants from raising any objection to the DIP Lending Order, and (c) extended the time of certain parties, including Berlin, to object to the DIP Lending Order. In combination, these orders preserved Berlin's rights and extended its time to object to the DIP Lending Order and to receive adequate protection to the extent of any subordination to the DIP Lenders.

5.    Were the DIP Lenders buyers in the ordinary course, or good faith purchasers, based on the record before the Court, or did they succeed to the UCC rights of the pre-petition lenders? ANSWER: No. DIP Lenders obviously are not buyers in the

ordinary course of business or good faith purchasers of inventory that is subject to a

§546(c) right of reclamation.  Furthermore, they were oversecured by billions of dollars

(several times the value of their loan).  Also, the DIP Lenders did not buy or otherwise

acquire the rights of the pre-petition lenders.  In any event, even if the DIP Lenders'

security interest is superior to Berlin's reclamation rights, any surplus collateral should be

available to Berlin, after the DIP Lenders are paid in full.

The standard of appellate review of these issues depends upon whether each issue

is one of law or of fact.  A district court reviews a bankruptcy court's conclusions of law

*de novo.  In re Cody, Inc.,* 338 F.3d 89, 94 (2d Cir. 2004);  *In re 139-141 Owners Corp.,*

313 B.R. 364, 367 (S.D.N.Y. 2004).  Findings of fact are reviewed for clear error, under

Bankruptcy Rule 8013.  *In re Cody, Inc.,* 338 F.3d 89, 94 (2d Cir. 2003).  A finding of

fact is clearly erroneous if the district court is "'left with the definite and firm conviction

that a mistake has been committed.'"  *In re Manville Forest Prods. Corp.,* 896 F.2d 1384,

1388 (2d Cir. 1990), quoting *United States v. United States Gypsum Co.,* 333 U.S. 364,

395 (1948).  The district court cannot take new evidence**;** it must make its determination

based upon the appellate record.  *In re Foust*, 52 F.3d 766, 768 (8th Cir. 1995) (reversible

error for district court to take additional testimony).  No witnesses testified at the hearing.

As per local custom and Local Bankruptcy Rule 9014-2, briefs were accepted in lieu of

testimony.  In this particular case, the Bankruptcy Court's procedural orders required the

Debtors to set forth in their initial brief all facts upon which their position was based, and

thus, in effect, the Debtors' brief was required to set forth a *prima facie* case at that time,

sustaining their affirmative "Prior Lien Defense" (which, we submit, they failed to do).

- 3 -

## STATEMENT OF THE CASE

The substantive facts applicable to this appeal are simple, but must be reviewed in the context of the Chapter 11 DIP lending process, the procedural and evidentiary rules imposed by the Bankruptcy Court, and the motion addressing the "Prior Lien Defense".

Fundamentally, Berlin sold goods for which it has not been paid.  All of the goods were sold after the effective date of the 2005 amendments to the Bankruptcy Code.  The Debtors filed Chapter 11 petitions on March 2, 2006.  Berlin served a timely reclamation notice pursuant to Bankruptcy Code §546(c), claiming $392,077.91 for the goods sold between 21 and 45 days prior to the Debtors' Chapter 11 filings.

The Debtors have alleged that more than 90% of Berlin's goods were sold to Reinz LLC, a subsidiary of Dana Corporation, and that the remainder of the goods were sold to Dana Corporation itself.  Thus, those are the only two Debtor entities involved in this appeal.  The procedural orders of the Bankruptcy Court require the parties to focus, for now, on the Debtors' so-called "Prior Lien Defense", and forbid the parties from addressing, at this time, any dispute as to which of these two entities was the buyer of Berlin's goods.  Berlin has assumed *arguendo* for purposes of this appeal that roughly 90% of the reclaimed goods were sold to Reinz LLC (but the exact numbers are not in the current record, since the Debtors' numbers included all three categories of claim asserted by Berlin, *i.e.*, general unsecured claims, administrative expense claims, and reclamation claims, and only the reclamation claims are at issue on this appeal).

The Debtors' "Prior Lien Defense" asserts, in essence, that a seller's reclamation rights are wiped out if the buyer has a lending bank that has filed a UCC statement

- 4 -

covering all of the buyer's after-acquired inventory, and in any event that the DIP

Lenders acquired the pre-petition banks' UCC security interest, by court order.

The first flaw in the Debtors' position is that there is no evidence, in the record or

otherwise, that there was any UCC statement signed by the Reinz LLC in favor of the

Debtors' pre-petition lending banks. Instead, the only evidence shows that Reinz LLC

did not exist at the time the last UCC filings were made. Reinz LLC was not created

until December 22, 2005, less than 90 days before these Chapter 11 cases were filed on

March 3, 2006. Furthermore, the official schedules of assets and liabilities filed by the

Debtors in the Bankruptcy Court admit that Reinz LLC has no secured liabilities.

Accordingly, the Debtors' position, as to Reinz LLC, is groundless.

Turning to Berlin's reclamation claims against Dana Corporation — and also as

against Reinz LLC if the Debtors somehow establish that the after-acquired inventory of

Reinz LLC was in fact encumbered by the pre-petition banks' UCC filings — the record

confirms that the pre-petition banks have been paid in full, that they were paid with the

proceeds of the DIP loan, and that they were not paid with proceeds of the inventory

which is the subject of Berlin's reclamation rights. Plainly, the pre-petition banks' UCC

security interests in the inventory terminated when the banks were paid in full, from the

proceeds of the DIP Loan.

The DIP Loan arose shortly after the Chapter 11 petitions were filed, and resulted

from a series of orders entered in the Bankruptcy Court, first on a temporary basis and

later on a permanent basis, as per Bankruptcy Rule 4001, Local Bankruptcy Rule 4001-3,

and General Order No. M-274 of the Southern District Bankruptcy Court. In this

particular case, the final DIP lending order expressly**:** (a) reserved the rights and liens of prepetition secured parties (a term which should include sellers who have a right of reclamation)**;** and (b) stated that the DIP lending liens are "junior" to pre-existing liens (which we submit should include rights of reclamation)**;** and (c) extended the time for objections to the relief granted to the DIP Lenders (Exhibit "E" to the Debtors' Initial Brief, ¶¶ 6, 6(c), 25 and 30) (hereinafter the "<u>Final DIP Lending Order</u>").  Regarding the time within which sellers such as Berlin could challenge the DIP liens or seek adequate protection under §361 or §364, the Bankruptcy Court set exclusive procedures for asserting §546 reclamation claims, in the Bankruptcy Court's Order dated March 6, 2006 (<u>Document #82</u>), as amended by Order dated March 29, 2006 (<u>Document #724</u>) (hereafter jointly referred as the "<u>Reclamation Procedures Order</u>").  Specifically, ¶25 of the Final DIP Lending Order permitted objections to be made "no later than June 19, 2006 [***], or (y) as has been ordered by the Court (the 'Challenge Period')" (Exhibit "E" to the Debtors' Initial Brief, ¶25, at the top of p. 37).  The Reclamation Procedures Order prohibited the reclamation claimants from filing any separate challenge to the several DIP lending orders in regard to the reclamation claimants' rights, including their right to adequate protection, and thus, under ¶25 of the Final DIP Lending Order, operated to grant the reclamation claimants a time extension of their "Challenge Period" within which to seek such adequate protection or otherwise object to the Final DIP Lending Order.  Berlin objected to the Final DIP Lending Order at its first opportunity to do so, that is, when it filed its brief in response to the Debtors' initial brief on the Debtors' "Prior Lien Defense" motion now under appeal — Berlin had been prohibited

from doing so until then, by the Reclamation Procedures Order.

The Debtors have admitted that the DIP Lenders, like the pre-petition banks, are greatly over-secured (*e.g.*, Debtors' Initial Brief at p. 5, FN 13; and ¶3(c) of the Final DIP Lending Order annexed thereto as Exhibit "E"). Thus, the DIP Lenders will not need the proceeds of the reclaimed goods in order to be made whole, and at this point, it seems incomprehensible to "trace" the proceeds of the sale of any such specific assets to the repayment of the DIP Lenders. In any event, there is nothing in the record from which any of the proceeds could be "traced".

The Bankruptcy Court's decision valuing all of the reclamation claims at "zero", published as *In re Dana Corporation*, 367 B.R. 409 (Bankr.S.D.N.Y. 2007), did not address the facts relating to Reinz LLC as distinguished from Dana Corporation, and simply held that all reclamation claims against all of the Debtors were worth "zero", on the basis that they had been effectively wiped away by the Final DIP Lending Order.

## ARGUMENT

### POINT I:    BERLIN'S CLAIM SHOULD BE VALUED AT $392,077.91

Berlin's reclamation claim arising under Bankruptcy Code §546(c), for goods sold to the Debtors during the period from 21 to 45 days prior to the Chapter 11 filings, should be valued at $392,077.91. The Debtors' "Prior Lien Defense" should be dismissed.

Congress passed the "Bankruptcy Abuse Prevention And Consumer Protection Act Of 2005" ("BAPCPA") to change prior law, and indeed to change it to be more favorable to creditors. The 2005 BAPCPA revision to §546(c) was designed to

encourage sellers to sell on credit to marginal buyers, perhaps in the hope that the buyers could remain in business and avoid any bankruptcy filing at all.

The 2005 BAPCPA amendment to §546(c)(1) is somewhat obtuse but does two things very clearly:  First, in relation to goods that were bought by the debtor on credit shortly before the bankruptcy filing, the statute strips bankruptcy trustees and debtors in possession of the rights and powers, otherwise granted under §§ 544, 545, 547 and 549, to acquire the highest priority lien or interest in all of the debtor's property (powers which otherwise would have allowed the trustee or debtor in possession to sell that property or to use it as collateral security with which to obtain post-petition financing). Second, the revised §546(c)(1) recognizes that sellers who meet certain criteria may reclaim goods sold in the ordinary course of the seller's business if the debtor has received those goods while insolvent, within 45 days prior to a bankruptcy filing, "subject to the prior rights of a holder of a security interest in such goods or the proceeds thereof" (11 U.S.C. §546(c)(1)).

Nothing in §546, or in the legislative history of the BAPCPA, permits the Debtors to assert a "Prior Lien Defense" to such a seller's reclamation rights.  Certainly there is nothing in the statute which permits a Debtor to turn this amendment on its ear and use it as a basis for eliminating all of the reclamation claims of all of the sellers who sold goods on credit to the Debtors within the last 45 days prior to their Chapter 11 filings, simply on the basis that the Debtors violated the limitation on their "rights and powers", and obtained DIP financing in contravention of the statute.

Indeed, the current dispute is not between Berlin and the DIP Lenders, or between

Berlin and the pre-petition banks.  This dispute is between Berlin and the Debtors.  The

DIP Lenders are grossly oversecured — by billions of dollars, amounting to several times

the debt they are owed, and they are going to get paid from their security regardless of

whether the Berlin goods are included in their security or not.  The same would apply to

all the other goods sold by all the other reclamation claimants as well.  Thus, there is no

issue as to whether the DIP Lenders will be repaid, if a priority is granted to the Berlin

reclamation claim (or any or all of the other reclamation claims, including those which

have not been appealed).

The real issue is whether a debtor can, in blanket fashion, wipe out all of the

reclamation claimants, representing all of the claims for goods purchased by the debtor

during the period from 21 to 45 days prior to Chapter 7 or Chapter 11 filing, even though

neither the pre-petition lenders nor the DIP lenders genuinely need any of the collateral

that was furnished by the reclamation claimants.  In other words, this appeal presents a

fundamental issue to the nature of bankruptcy, and particularly Chapter 11 proceedings,

as to whether debtors can go out shortly before an anticipated bankruptcy filing, and

purchase scads of goods on credit, with no intention of ever paying full dollar for them,

and then use those goods as part of the debtor's collateral with which to obtain Chapter

11 DIP financing.  For a variety of reasons, the answer should be a resounding "no".

It is part and parcel of the Debtors' approach in this case to use the existence of

the DIP Loan not simply to subordinate the reclamation claims to the rights of the DIP

Lenders, but to completely extinguish all reclamation rights of all sellers, even if the DIP

Lenders get paid in full and have billions of dollars worth of unused collateral left over.

We respectfully submit that under the BAPCPA, the DIP Lenders should not come ahead of the reclaiming sellers at all.  Furthermore, under the facts of this case, there is no basis for holding that the DIP Lenders have succeeded to the secured rights of the pre-petition lenders, simply by virtue of the DIP Loan proceeds being paid over to the pre-petition lenders.  If the DIP Lenders wanted the pre-petition lenders' rights, they could have executed an assignment — which they did not, and which clearly would be subject, however, to various restrictions and caveats adverse to their interests.

Secondarily, even if the DIP Lenders are allowed to be paid ahead of the reclamation claimants, the reclamation claims should nevertheless remain in place and be permitted to collect out of the reclaimed goods, or their proceeds, after the DIP Lenders are paid in full.  Accordingly, we submit that the reclamation claim of Berlin should have been "valued" at the full $392,077.91 which is sought, even if there were a determination that the reclamation claim was subordinate to the rights of the DIP Lenders, or even to the rights of the pre-petition lenders.  Declaring the "value" to be "zero" was therefore error, inasmuch as the "Prior Lien Defense" should only be recognized, if at all, as subordinating the reclamation claims to the so-called "prior liens".

The reclamation claim of Berlin should therefore be valued at $392,077.91, and the Court should then consider whether the Debtors' so-called "Prior Lien Defense" subordinates that amount to the liens of the DIP Lenders, or not.  The remainder of this Brief addresses the ruling of the Bankruptcy Court to the effect that the reclamation claim was not only subordinate but was wiped clean by the Final DIP Lending Order and thus should be valued at "zero".

## POINT II:    NO PRIOR LIEN DEFENSE EXISTS AS TO REINZ LLC

The Reinz LLC entity, to which the Debtors themselves contend most of the Berlin goods were sold, did not even exist when the UCC financing statements on which the Debtors are relying were filed.  Because the Bankruptcy Court did not determine how much of the goods were sold to Reinz LLC, and the current record is unclear as to which of several different possible numbers should be used in determining the amount sold to that entity within the 21 to 45 day period prior to the Chapter 11 filing, the case should be remanded for a determination of the correct amount to be claimed against Reinz LLC, which apparently will be between about 85% and 100% of the $392,077.91 sought by Berlin under §546(c).

The Debtors' entire "Prior Lien Defense" is premised in the first instance upon their assertion that the Debtors' inventory was subject to a UCC lien in favor of their pre-petition banks, by reason of certain UCC financing statements signed by the Debtors and filed pre-petition.  Indeed, Judge Lifland's decision sustained the "Prior Lien Defense" on the basis that "the lien chain continued unbroken" (367 B.R. at 421).  However, no evidence was presented that Reinz LLC signed any such financing statements, and no such evidence could possibly exist, since Reinz LLC was not even in existence at the time those UCC statements were signed and filed, including the last of the amendments.

The last of the pre-petition UCC transactions described in Judge Lifland's decision was dated November 18, 2005.  Reinz LLC was formed and duly registered more than a month later, on December 22, 2005 (see Delaware Division of Corporations, https://sos-

- 11 -

res.state.de.us/tin/GINameSearch.jsp) — this information was furnished by Berlin to the

Bankruptcy Court, which was required to take judicial notice of it under Fed.R.Ev. 201.

Moreover, the Schedules of Assets and Liabilities of Reinz Wisconsin Gasket LLC

assert that it has only one secured creditor, to whom its liability is represented to be "0"

(Document #1637 at p. 1 and Document #4049 at p. 1 of Exhibit 19).  Separately, Exhibit

D-1 to Schedule "D" to Document #1637 lists five supposedly secured creditors of

Reinz LLC, but the "filing date" of the UCC listed for each of them was prior to the time

Reinz LLC was even created, and thus the filings cannot have any validity or effect.

Accordingly, there are no secured creditors of Reinz LLC who can come ahead of any

reclamation claim Berlin may have against that entity, and the so-called "Prior Lien

Defense" therefore simply does not exist as to sales made by Berlin to that entity.

Furthermore, less than 90 days after the Reinz LLC entity was formed on

December 22, 2005, it filed its Chapter 11 petition on March 3, 2006, raising an issue as

to whether any security interest which might have been filed (such as one relating to the

pre-existing revolving credit agreement referenced in the Debtors' Initial Brief and in the

Bankruptcy Court's decision) would be a voidable preference (unless it was based on

contemporaneous new consideration, which it obviously was not, and in any event no

evidence was presented indicating that it was, notwithstanding the court order requiring

the Debtors to set forth a prima facie case in their initial brief).

Incidentally, after the record was closed on the motion and order now on appeal,

the Debtors' counsel asserted informally to Berlin's counsel that Reinz LLC had merged

with another entity which had signed the UCC statement, citing Delaware General

Corporation Code §259.  However, the public records of the Delaware Department of State, including the merger certificate furnished by the Debtors' counsel, confirm that the merger did not occur under that section (which is not applicable to LLC mergers), and instead was accomplished under §264 — which, unlike §259, does not make the acquiring entity responsible for the acquired entity's debts.  Of course, if the Debtors had wished such a result, they could have merged under §266 instead of §264, but they elected not to.  Furthermore, there is no authority for the Debtors' contention that a UCC filed against the acquired entity will operate to encumber new inventory purchased by the acquiring LLC after the acquisition.  Thus, the Debtors' contention that the inventory bought by Reinz LLC from Berlin is encumbered under the UCC filed by the Debtors' banks is completely baseless.

Since the Bankruptcy Court's procedural orders required the Debtors to set forth their prima facie case in their brief, and at the very least to produce documentation during the discovery phase of these proceedings, their complete failure to have come forward with any fact showing that any inventory purchased by Reinz LLC from Berlin was encumbered requires denial of their motion, as regards sales by Berlin to Reinz LLC.

### POINT III:  THE DEBTORS HAD NO POWER TO CONVEY A SECURITY INTEREST TO THE DIP LENDERS

The 2005 BAPCPA amendment to §546(c)(1) restricts the rights and powers of a debtor in possession to acquire full possession of the bankruptcy estate, as a so-called "perfect lien creditor", and thereby to use the goods which have been reclaimed by a seller pursuant to the statute, to obtain debtor-in-possession financing.  The Debtors in

this case proceeded as though the 2005 amendment had never been enacted.  They

obtained a series of far-reaching DIP lending orders, and obtained an over-reaching order

prohibiting the reclamation claimants from even saying anything about the procedures the

Debtors were putting into place and the orders they were asking the Court to grant them.

In so doing, it is submitted that the Debtors failed to comply adequately with General

Order No. M-274 of the Southern District Bankruptcy Court, section II(A), which

required the Debtors to highlight "Extraordinary Provisions" and states in part as follows

at the end of paragraph II(A)(2):

> An order approving a rollup must ordinarily reserve the right of the Court
> to unwind the paydown of the prepetition debt in the event that there is a
> timely and successful challenge to the validity, enforceability, extent,
> perfection, and (where appropriate) priority of the prepetition lender's
> claims or liens, or a determination that the prepetition debt was
> undersecured as of the petition date.

In any event, the outcome of the current proceedings has been contrary to the

fundamental concept of Chapter 11 that has been recognized at least since the current

Bankruptcy Code was adopted in 1978, under which it has been recognized that pre-

petition creditors whose "interests" (*i.e.*, not just liens) in specific assets are affected by

the debtor in possession's financing activities must be granted "adequate protection"

before those assets can be pledged to the DIP lenders.  See, *e.g.*, Bankruptcy Code §§

361-364 and Bankruptcy Rule 4001.  The rights and powers of bankruptcy trustees (and

hence debtors in possession, which obtain the same rights and powers as a trustee) to

obtain the debtor's assets are set forth in Bankruptcy Code §542, in the first instance.

However, where those assets are encumbered by pre-petition liens and other interests, the

trustee or debtor in possession must have power to overcome such third-party creditors' rights — that power is granted in §§ 544, 545, 547, and 549, but the 2005 BAPCPA amendment to §546(c) expressly limited that power where the reclamation rights of sellers of goods are concerned.  This appeal involves the limitation of those rights and powers.

Simply put, it is Berlin's position on this appeal that the Debtors did not have the right or power to use the reclaimed goods that had been sold to the Debtors by Berlin, as collateral security with which to obtain DIP Lending financing from the DIP Lenders, unless Berlin first received "adequate protection" under §361, because Berlin's reclamation rights are protected under §546(c)(1).  As a related matter and as is discussed elsewhere in this Brief, it is Berlin's position that the orders of the Bankruptcy Court, when read carefully, confirm that the DIP Lending Orders did not actually grant a security interest in those goods to the DIP Lenders, because those order reserved Berlin's rights (that is, either Berlin's substantive rights or Berlin's right to object to the Final DIP Lending Order at a later date, or both).  However, since the Debtors disagree with that analysis (and the Bankruptcy Court ruled in favor of the Debtors, without addressing this position despite Berlin having raised it in the court below), Berlin submits that the Debtors lacked the power to grant such a security interest in contravention of Berlin's reclamation rights, and therefore that the Final DIP Lending Order must be interpreted in a manner consistent with this limitation.

Judge Lifland addressed §546(c), in effect, by holding simply that the BAPCPA did not create a new federal bankruptcy law right of reclamation, theorizing that if it had

done so, "in bankruptcy a reclaiming seller would conceivably have broad rights superior to those of buyers in the ordinary course of business, lien creditors or good faith purchasers other than a holder of a prior security interest." The short answer to this analysis is, of course, that no one has suggested that the section could be interpreted in such a manner.

Congress placed its reference to "the right of a seller *** to reclaim such goods" in §546(c), which addresses only the competing rights of a bankruptcy trustee or a debtor-in-possession to use the goods as collateral or to sell them, free and clear of the seller's reclamation rights. Nothing in §546 mentions, or would prejudice the rights of, buyers in the ordinary course of business who acquire title to the goods (as compared to a DIP lender who acquires only a security interest in them and who has intimate knowledge of the Chapter 11 proceedings).

A ruling in favor of the reclamation claimants in this case requires only that this Court recognize that Congress, which created the rights of bankruptcy trustees and of debtors in possession, has now limited those rights to the extent of a countervailing right in favor of sellers who meet the stated criteria — if the debtor received the goods while insolvent within 45 days before a bankruptcy filing, and provided the seller serves the required reclamation demand.

**The 2005 BAPCPA Amendments**

The statutory construction favoring the reclamation claimants is based on the clear meaning of the plain language of the 2005 amendments. See *Perrin* v. *United States*, 444

U.S. 37, 42 (1979) (statutory words should be given their ordinary meaning).  Those

amendments, to the extent relevant to this appeal, were integrated into three separate

subsections of the statute, *i.e.*, §546(c)(1), and §546(h), and §546(i), all of which must be

construed in conjunction with each other.  Plainly, §546(c)(1) creates federal reclamation

rights and makes them subject to certain "prior rights", §546(h) permits a debtor to

voluntarily return the goods subject to the same "prior rights", and §546(i) preserves

certain warehouseman's liens, which would be one example of the "prior rights of a

holder of a security interest" mentioned in the other two subsections — and in this regard,

another example of such "prior rights" would be security interests in the goods which had

been given by the <u>seller</u> to the <u>seller's lenders</u> (as distinguished from security interests

granted by the <u>buyer</u> to the <u>buyer's lenders</u>, which would be subordinate to the

reclamation rights of the seller and of the seller's own secured lenders).

Incidentally, although a single section of the 2005 Act added the language

regarding these "prior rights of holders of security interests" in §546(h), and also the

warehouseman's lien protections contained in §546(i), whereas a different section of the

2005 Act added the substantially identical language to §546(c), it is clear that all three of

these subsections were intended to be interpreted in a consistent manner.  See Pub. L. No.

109-8, 119 Stat. 23 ("2005 Act"), Sections 406 and 1227, respectively.

By amending §546(c)(1), Congress recognized that sellers should have a federally-

protected right of reclamation which is superior to the rights of trustees and debtors in

possession relating to the goods which the seller was trying to reclaim.  If the words "the

right of a seller *** to reclaim such goods" was not intended to refer to such a right of a

seller, under federal law, to prevail over the federally-created rights of a bankruptcy trustee or debtor in possession, where do those rights arise?  In any event, even if §546(c)(1) does not create a federal right of reclamation, it creates a federal prohibition against the trustee or debtor in possession using goods purchased within 45 days prior to a bankruptcy filing, while the debtor was insolvent, as collateral to secure DIP financing, and a similar prohibition against the sale of such goods by the trustee or debtor in possession in violation of the seller's common law right of reclamation.

Moreover, if the right of reclamation that was added to §546(c) is not a federal right and is essentially unenforceable, can the same be said about the other federal rights that were added by the BAPCPA to other parts of the Bankruptcy Code, such as in §546(h) regarding the return of goods, and §546(i) regarding warehouseman's liens, and §546(j) regarding master netting agreements, and §547(c)(3) regarding purchase money security interests?  In this last regard, it is submitted that §547(c)(3) and §546(c)(1) should be read in conjunction with each other, and by way of comparison, the §546(c)(1) federally-created 45-day reclamation rights extend the seller's time to take action slightly longer than the §547(c)(3) federally-created 30-day time period for perfecting a purchase money security interest (as compared to the state-created 20-day time period under the UCC), but such a reclaiming seller's rights are conditioned upon the buyer having been insolvent at the time of the sale — an adequate distinction on which to base this different rule.  In any event, when Congress has spoken on such a subject, it does not seem appropriate for a court to pick and choose among the rights Congress has instructed them to enforce, especially where Congress clearly had the power to act, under the interstate

commerce clause.

## Comparison with State Law

A §546(c)(1) reclamation claim is not subject to the state law rules contained in the UCC, because the rights created by §546 are federally-based rights, exercisable only in a bankruptcy proceeding filed under federal law, which preempts state law. Neither state laws in general, nor the UCC in particular, governs proceedings in bankruptcy. Indeed, UCC 9-109(c) recites that UCC Article 9 "does not apply to the extent that [* * *] a statute, regulation, or treaty of the United States preempts this article". Furthermore, not every form of security interest or other cognizable right is required to be filed in order to be enforceable against a UCC security interest. See, *e.g.*, UCC 9-109(d).

The §546 reclamation right is just another example of a non-UCC-based right, having limited application, but enforceable nonetheless. Another way of looking at this is that Congress availed itself of UCC 9-311(a) ("Security interest subject to other law") and decided that a "purchase-money security interest" should attach immediately upon the buyer's receipt of goods from a seller in the ordinary course of the seller's business, but only if (1) the buyer enters bankruptcy within 45 days, and (2) the seller makes a valid reclamation demand no later than 45 days after delivery of the goods or 20 days after the bankruptcy filing, whichever is later. Compare UCC 9-309 ("Security Interest Perfected Upon Attachment"), and UCC 9-317(e) (which says that a purchase-money security interest attaches immediately, provided it is filed within 20 days).

This analysis is confirmed by the relationship between UCC 9-317(e), which

permits a purchase-money security interest to take effect immediately provided it is filed under the UCC within 20 days, and the 2005 amendment of Bankruptcy Code §547(c)(3), which now gives a seller/creditor 30 days from the date the debtor acquires an interest in the property, to perfect a purchase money security interest in that property. Similarly, in amending §546(c)(1) of the Bankruptcy Code, Congress effectively declared the 20-day time period allowed by the UCC for the filing of a purchase-money security interest to be too short and too onerous where bankruptcy abuse had been committed — that is, where an insolvent buyer had bought last-minute goods on credit, within 45 days prior to filing bankruptcy. In effect, Congress declared there to be no reason why a seller who had been defrauded should need to file a purchase-money UCC, and accordingly, Congress says the seller can serve a reclamation demand instead, within 20 days after the bankruptcy filing (provided the bankruptcy filing is no more than 45 days after receipt of the goods).

Also significant is that UCC 9-315 states that once goods are sold, a security interest continues to attach to the proceeds of the sale for an additional 20 days. While any application of this provision to the sale proceeds in this case is beyond the permitted scope of the current brief in light of the scheduling order, it is submitted that this section shows another example of a UCC security interest which may be subject to other rights that are enforceable on a temporary conditional basis, like a federal right of reclamation.

**Comparison with the Secured Lenders' Rights**

Nor do the rights of the Debtors' secured lenders, whether pre-petition or post-petition, defeat the reclamation rights of Berlin. In this regard, it is respectfully

submitted that Judge Lifland erred in stating that the Bankruptcy Code gives no indication as to what the "prior rights" might be, to which the rights of the reclaiming seller are subject, under §546(c)(1). Actually, the Bankruptcy Code, and indeed the 2005 BAPCPA amendments themselves, furnish considerable guidance as to what is meant by that phrase.

In §546(c)(1), the term "subject to the prior rights of holders of security interests in such goods or the proceeds thereof" is a <u>limitation</u> on the rights of the <u>trustee</u> (and the debtors-in-possession) to use the goods, or their proceeds, for Chapter 11 financing purposes or otherwise. When that language was added to §546(c)(1), the BAPCPA also added a similar "prior rights" limitation containing substantially the same language to §546(h), authorizing a debtor in some instances to return the goods to the seller. In both of these subsections, §546(c)(1) and §546(h), the phrase "prior rights of a holder of a security interest" was added <u>not</u> to protect the rights of a secured creditor of the debtor, but instead to protect holders of warehouse liens as described in §546(i), and also to protect anyone else holding a security interest in the <u>seller's</u> goods and proceeds (which would otherwise be returned to the seller itself instead of to the seller's lender, in the absence of any such language in the statute) — not someone holding a security interest in the <u>buyer's</u> goods and proceeds (which would be subject to whatever conditional "interests" applied to the buyer's own rights, such as the seller's conditional right of reclamation that is described in §546(c)(1)).

Neither the plain language of the statute, nor the legislative history, nor the prior interpretations of the Bankuptcy Code indicate that the clause "prior rights of a holder of

a security interest" refers to secured creditors of a <u>debtor</u>.  As mentioned above, the

secured creditors of the debtor can have no greater rights than the debtor itself, and thus

their rights are subject to the reclamation rights of the sellers, just as the debtor's right to

keep the goods is subject to those reclamation rights of the sellers.

If the new version of the Bankruptcy Code were referring to "<u>secured creditors</u> of

the <u>debtor</u>", it would have used a different expression than is used in §546(c)(1) and

§546(h) — it would have referred to a "creditor secured by a lien" (as it does in §506), or

a "secured claim" (as in §506), or similar language referring to secured "<u>creditors</u>" of a

"<u>debtor</u>".  By way of contrast, the phrase "prior rights of a holder of a security interest" is

not used anywhere else in the Bankruptcy Code.  Nor does the term "prior rights" appear

to have come from the pre-2005 caselaw under the previous version of §546.  Thus, it

would be inappropriate to say that the new statute merely codified prior caselaw such as

*Pester Refining Co. v. Ethyl Corp. (In re Pester Refining Corp.)*, 964 F.2d 842, 845-46

(8th Cir. 1992), or *In re Child World, Inc.*, 145 B.R. 5 (Bankr.S.D.N.Y. 1992), or *In re*

*Wheeling-Pittsburgh Steel Corp.*, 74 B.R. 656 (Bankr.W.D.Pa. 1987).  None of those

cases used the term "prior rights", nor have we found any others that did.  Obviously,

Congress chose this "prior rights" phrase to override previous caselaw, not to codify it.

We submit that in selecting this language ("prior rights"), Congress wanted to

make sure that when it enacted a law under which the sellers could get back their goods,

the warehousemen who had transported and stored the goods, and the bank that had

financed the seller, would not find their UCC security interests in the seller's inventory to

have been voided by the new law which was creating a federal right of reclamation under

which the goods would be returned to the "seller" (not the seller's bank).  In choosing

this language "prior rights of a holder of a security interest", Congress avoided referring

to the familiar terms "creditor" and "debtor".  Moreover, although the words used could

theoretically include a secured creditor of a debtor, their rights would be subject to the

seller's right of reclamation in any event, and thus are excluded necessarily.  Under the

Interstate Commerce Clause and the Bankruptcy Clause of the U.S. Constitution,

Congress clearly had the right to enact a statute providing the sellers of goods the

reclamation rights which are set forth in §546(c)(1).  See, *e.g.*, *Barnett Bank of Marion*

*County, N. A. v. Nelson*, 517 U.S. 25 (1996)**;** *United States Dep't of Treasury v. Fabe*,

508 U.S. 491 (1993)**;** *United States v. Lopez*, 514 U.S. 549 (1955)**;** The Federalist No.

42, at 287 (Madison, J.).  In establishing this new right, Congress also placed significant

conditions on its enforceability, such as the requirement that the buyer have been

insolvent and that the right be enforceable only in the event of a bankruptcy filed within

45 days.  Plainly, these conditions on the enforceability of the right of reclamation are

sufficient to protect the interests of a purchaser's bank who obtained a security interest in

the purchaser's inventory, but whose loan proceeds were not used to pay for the specific

inventory that is subjected to the reclamation lien.  In this regard, obviously, if the

lender's loan to the debtor had been used to pay for the goods, the seller would not have

any reclamation and the issue would be moot (and would not fall within the statute).  The

statutory conditions placed upon the exercise of the reclamation right are therefore well

within constitutional guidelines, and accordingly the reclamation rights must be enforced.

Furthermore, although §541(c)(1) contains certain limitations upon the type of

restrictions and conditions which can be placed on transactions by contracts and by

"applicable nonbankruptcy law" (see *Patterson* v. *Shumate*, 504 U. S. 753 (1992)), the

reclamation right created by the 2005 amendments is obviously a "bankruptcy law", by

its inclusion in Title 11 and in the 2005 Act addressing "Bankruptcy Abuse Prevention".

Furthermore, even without such a statute, a court of equity would be justified to

declare that goods purchased by an insolvent buyer who knew it was incapable of making

payment for them, or the proceeds of such goods, must be held in constructive trust for

the benefit of the seller, in light of the apparent and/or implied fraud engaged in by the

debtor/buyer in failing to tell the seller that bankruptcy was imminent and/or that the

credit terms obtained were unwarranted.  See, *e.g.*, *Seller's Right to Reclaim Property*

*Under Section 2-702(2) of the Code Under the Bankruptcy Act: Fact or Fancy*,

Weintraub & Edelman, 32 Bus.Law 1165, 1167 (1977).  In that event, the constructive

trust *res* would similarly not constitute "property of the estate" within the meaning of

§541.  See *In re Howard's Appliance Corp.*, 874 F.2d 88 (2d Cir. 1989)**;** *Yonkers Bd. of*

*Educ. v. Richmond Children's Center, Inc.*, 58 B.R. 980 (S.D.N.Y. 1986)**;** *In re UDI*

*Corp.*, 301 B.R. 104 (Bankr.D.Mass. 2003)**;** *In re Globe Store Acquisition Co., Inc.*, 178

B.R. 400 (Bankr.M.D.Pa., 1995).  We thus submit that Congress, in passing the 2005

amendments to the statute, intended the same consequences — that sellers should get

their goods back or should get paid out of the proceeds, which the debtor-in-possession or

trustee is likely to still have at the time a bankruptcy is filed, within 45 days of receipt of

the goods.  Similar statutes have long existed in specific contexts, such as those in many

states which require construction contractors who buy goods from their suppliers to hold

the proceeds in trust for the benefit of the suppliers (*e.g.*, New York Lien Law §§70-71**;** see also *Aquilino v. U.S.*, 363 U.S. 509, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960).

Under the pre-2005 bankruptcy reclamation rules, UCC 2-702 specifically limited the ability of a reclamation claimant to seek the imposition of a constructive trust.  See, *e.g.*, *Matter of Deephouse Equipment Co., Inc.*, 22 B.R. 255, 258 (Bankr.D.Conn. 1982); *Kennett-Murray & Co. v. Pawnee Nat'l Bank*, 598 P.2d 274 (Okla. App. 1979). However, no such limitation was placed by Congress on the federally-created right set forth in the amended Bankruptcy Code §546(c), and it can be assumed that Congress compared the text of its new amendment with the provisions it was seeking to replace, and approved of the difference.  See *Patterson* v. *Shumate*, *supra*, 504 U. S. 753 (1992); *Erlenbaugh v. U.S.*, 409 U.S. 239, 243-244 (1972).  Indeed, in enacting these amendments, Congress may have intended to codify the extent to which such a constructive trust theory might be pursued in a given case, thereby avoiding the potentially significant and protracted litigation over constructive trust concepts that might otherwise be raised in the litigation that it recognized was certain to follow.  *Cf.*, *In re Adelphia Communications Corp.*, 325 B.R. 89, 112-113 (Bankr.S.D.N.Y. 2005), *affirmed in part and reversed in part on other grounds*, 331 B.R. 93 (S.D.N.Y. 2005).

The pre-2005 caselaw generally supported the view that even under the UCC and the former §546, a seller maintained a reclamation claim (or some alternative recognition of its right to payment, such as entitlement to a post-petition administrative expense claim) even where the goods had been consumed or sold or had become subject to a competing security interest.  See, *e.g.*, *Pester Refining Co. v. Ethyl Corp. (In re Pester*

*Refining Corp.), supra,* 964 F.2d 842, 845-46 (8th Cir. 1992); *Griffin Retreading Co. v. Oliver Rubber Co. (In re Griffin Retreading Co.),* 795 F.2d 676, 680 (8th Cir. 1986); *United States v. Westside Bank,* 732 F.2d 1258, 1265 (5th Cir. 1984); *In re Roberts Hardware Co.,* 103 B.R. 396, 398 (Bankr.N.D.N.Y. 1988).  Under the pre-2005 version of §546(c), it was held in *In re Diversified Food Service Distributors, Inc.,* 130 B.R. 427 (Bankr.S.D.N.Y. 1991), that where a competing security holder's rights prevented the seller from reclaiming the goods, the seller was entitled to an administrative expense claim, as follows:

> Because the reclaiming sellers have satisfied the prerequisites of 11 U.S.C. §546(c), but are prevented from enforcing their reclamation rights against CIT's superior status, they are entitled to an administrative expense priority claim in accordance with 11 U.S.C. §546(c)(2)(A) [* * *].

See also *In re Georgetown Steel Company, LLC*, 318 B.R. 340 (Bankr.D.S.C. 2004), which collected the applicable authorities in 2004 and ruled favorably to the suppliers.

To the extent of any of the pre-2005 authorities might suggest that the reclamation rules should favor debtors rather than sellers, such as *In re Dairy Mart Convenience Stores, Inc.*, 302 B.R. 128 (Bankr.S.D.N.Y. 2003), and *In re Flagstaff Foodservice Corp.*, 14 B.R. 462 (Bankr.S.D.N.Y.1981), it is submitted that they reflect precisely what Congress was seeking to change when it amended the statute in 2005 to remedy the unfairness faced by sellers who sell goods in the ordinary course of their businesses to insolvent customers who then file bankruptcy.  Indeed, *Flagstaff* confirms that a change was needed, from the outset of the 1978 Code, and invited Congress to revise the statute (which took Congress almost 25 years to do).

The interpretation of the statute urged by the Debtors is that, in effect, an insolvent company can go out and buy all the goods it can get its hands on, during the 45 days before a Chapter 11 filing, without ever intending to pay the sellers for the goods, and use those goods to reduce its pre-petition corporate debt (much of which may have been further secured by the personal guarantees of the greedy and/or fraudulent corporate officers).  In the process, such a debtor could also use the newly-purchased goods to secure its anticipated Chapter 11 DIP lending package, at the expense of the unsuspecting suppliers who were willing to "work with us" in the dark days preceding the bankruptcy filing.  This kind of logic is precisely what the 2005 "Bankruptcy Abuse Prevention" Act was designed to forestall.  We submit that this Court should not encourage any dilution of these intentions of our Congress.

Accordingly, this Court should not interpret the Final DIP Lending Order in a manner which would impair the reclamation rights of Berlin, and thus the Court should reverse the order of the Bankruptcy Court.

### POINT IV:   THE DIP LENDERS DID NOT GET PRIORITY OVER BERLIN

It is Berlin's position that, regardless of whether the Bankruptcy Court's interpretation of §546(c) was correct or not, the Final DIP Lending Order did not in fact grant the DIP Lenders priority over the reclamation rights of Berlin.  In brief, adequate protection had to be furnished to reclamation claimants under §361 before their collateral could be used to secure the DIP Lenders.  Under §364(d), the DIP Lenders could not get a senior lien unless there were adequate protection furnished to existing

lienholders, or, as is further discussed herein, anyone having a superior "interest" in the property (*i.e.*, even if that "interest" is not a "lien").  In any event, the Final DIP Lending Order provided, at paragraphs 6 and 6(c) that the DIP Lenders' liens are "Junior Liens" granted under §364(c)(3), to the extent there are pre-existing liens — which would include the reclamation claims.  Furthermore, the Final DIP Lending Order (Exhibit "E" to the Debtors' Initial Brief) says nothing in the order shall affect the "rights" of any "supplier" of any Debtor, specifically including "the validity, enforceability or priority of any setoff, recoupment or other claim, right or defense (each, a 'Deduction') of any customer or supplier of any Debtor in respect of any account [* * *]" (¶30).

The Bankruptcy Court's Order dated October 13, 2006, setting additional procedures for briefing the issues relating to the reclamation claims, states that the Debtors' Initial Brief "shall set forth the facts upon which they are relying upon in support of the Prior Lien Defense."  In this regard it is significant that §363(p)(1) states that in any hearing under §363, "the trustee [or the debtor-in-possession] has the burden of proof on the issue of adequate protection".  A similar provision is contained in §364(d)(2).

This Court does not necessarily need to determine at this time whether the reclamation right granted to sellers by §546(c)(1) actually constitutes a "<u>lien</u>" or a "<u>security interest</u>", for purposes of the definition of a "secured claim" within the meaning of §506 of the Bankruptcy Code.  §361 states that adequate protection is required where there is "an interest of an entity in property", a term which is broader than the word "lien" sometimes used in other sections of the Code, and which is broad enough to cover the

reclamation rights which are granted under §546(c)(1). Adequate protection may also be required under §362(d)(1) and/or §362(f) to continue the automatic stay (which the Bankruptcy Court's Reclamation Procedures Order barred motions to lift). Under §363, a trustee or debtor-in-possession "may sell property free and clear of any <u>interest</u> in such property of an entity other than the estate" <u>only under certain conditions,</u> including furnishing adequate protection — there is no requirement that there be a "lien", as opposed to an "interest" in such property, which again is a term broad enough to cover the reclamation rights of a seller of goods in the ordinary course of business under §546(c)(1). Indeed, in the decision now under appeal, Judge Lifland characterized the right of reclamation described in §546(c)(1) as "an *in rem* remedy" (367 B.R. at 419). Of course, an "*in rem* remedy" is a classic feature of an "interest in property". See, *e.g.*, *F.D.I.C. v. Four Star Holding Co.*, 178 F.3d 97 (2d Cir. 1999); *In re Trans World Airlines, Inc.,* 322 F.3d 283, 288-289 (3d Cir. 2003); *The Powers of Courts of Equity. I. "In Rem" and "In Personam",* Walter Wheeler Cook, *Columbia Law Review*, Vol. 15, No. 1 (Jan., 1915), pp. 37-54.

Furthermore, to the extent the <u>proceeds</u> of goods which are subject to such a reclamation right are also subject to that right (either under §363 or as described elsewhere in this Brief), §363 would require the consent of the seller of those goods, before the Debtor could use such "cash collateral". Although §363(g) grants the trustee or debtor-in-possession the power to sell property encumbered by certain vested or contingent rights, that power does not apply to goods covered by the reclamation rights granted under §546(c)(1)**;** Congress could easily have added such a reference to §363(g)

when it amended §546 in 2005, if it had intended to limit the newly-formulated federal reclamation rights it was granting — but it did not, because that was not its intent.

The Final DIP Lending Order expressly reserved the rights and liens of prepetition secured parties. It also recited that the DIP lending liens are "junior" to pre-existing liens. It also extended the time of the sellers to object to the relief granted to the DIP Lenders (Exhibit "E" to the Debtors' Initial Brief, ¶¶ 6, 6(c), 25 and 30), as was discussed above, inasmuch as the Bankruptcy Court's Reclamation Procedures Order set exclusive procedures for asserting reclamation claims under §546, thus preventing them from objecting to the DIP lending orders prior to now, based upon their reclamation claims.

Berlin therefore asserted such an objection, in its brief responding to the Debtors' motion now under appeal, to the effect that Berlin is entitled to either adequate protection (under §361, 362, 363 and 364), or subordination of the DIP Lenders' rights to the reclamation rights of Berlin (under §364(c)(3)), and/or an administrative expense priority under §507(b). Regarding these three potential entitlements, in essence and as elsewhere discussed in this Brief:

(i)    §§361-364 describe the adequate protection which must be furnished to the holder of an interest in property, such as the reclamation rights which sellers are granted by §546(c)(1), before that property can be used by the debtors-in-possession under §363, or before credit can be obtained by encumbering the property as collateral under §364(d). In addition, §361 requires that adequate protection be given in some instances where the automatic stay set forth in §362 is invoked by a debtor (see §362(d)).

- 30 -

(ii)    §364(c)(3) permits a debtor to use property which is already encumbered (such as goods that are encumbered by a reclamation right), to secure DIP lending in some instances, but only if it is "secured by a junior lien".

(iii)    §507(b) provides that a creditor who loses adequate protection previously provided to it can obtain post-petition administrative expense claim status under §§507(a)(2) and 503(b) (which is hereby claimed).

In the absence of such adequate protection or recognition of the superior status of the reclamation rights of the sellers, the Debtors were simply not authorized by the Bankruptcy Code or by the Bankruptcy Court's Final DIP Lending Order to use the goods which were received by the Debtors from the reclamation claimants, as collateral for the DIP loans, without the consent of the reclamation claimants.  Accordingly, the Prior Lien Defense must be rejected to the extent it is based upon the rights which the Debtors claim to have given the postpetition DIP lenders but which they were not empowered to grant.  Regarding those rights, the time within which the reclamation claimants are entitled to mount a challenge has not yet expired, by the terms of the Final DIP Lending Order itself.

The rights of the reclamation claimants such as Berlin should therefore be recognized, and the Debtors' motion denied, or else Berlin — which objected to the DIP Lending orders at its first opportunity — should be granted adequate protection.

### POINT V:    THE DIP LENDERS DID NOT ACQUIRE THE OLD LIENS

§546(c)(1) makes the reclamation rights of a seller subject only to the "prior rights

of a holder of a security interest in such goods or the proceeds thereof."  The DIP Lenders

obviously did not have any such "prior rights" in their own right, since as DIP Lenders

they did not arrive on the scene until after the Chapter 11 petition was filed, whereas the

goods were obviously sold by Berlin prior to the Chapter 11.  Thus, any "prior rights" of

the DIP Lenders could only exist if they were acquired from the pre-petition lenders.  The

record shows, however, that they were not.

Nevertheless, the decision below held that the DIP Lenders had obtained the same

security interests as had been held by the pre-petition lenders, and that "the lien chain

continued unbroken" (367 B.R. at 421), thereby eviscerating the reclamation rights of the

sellers.  We submit that this ruling was error, in that the DIP Lenders in fact did not

acquire the pre-petition security interests, and even if they did the reclamation rights did

not vaporize, but continued in place subject, at worst, to the priority of the DIP Lenders.

Although much of the discussion in the court below revolved around a question of

whether the DIP Lenders qualified as "good faith purchasers" by having succeeded to the

rights of the pre-petition enders, Judge Lifland's decision studiously avoided that issue.

At the very end of his decision, Judge Lifland did mention that the Final DIP Lending

Order had recited that the DIP Lenders had acted in good faith (367 B.R. at 421).

However, there was no actual finding that either the DIP Lenders or the pre-petition

lenders were in fact "good faith purchasers", even though the concept of "good faith

purchaser" was mentioned several times in the decision.

While obviously a DIP Lender could almost never be a good faith purchaser in its

own right of the goods which a seller is trying to reclaim from a bankrupt entity, in the

absence of a court order permitting the entity to sell the goods, there was much discussion in the proceedings below as to whether the DIP Lenders succeeded to the rights of the pre-petition lenders as good faith purchasers — or more accurately, as alleged good faith pledgees or secured parties that had previously advanced money with the expectation of being secured by all of the Debtors' inventory, even though that inventory was not being paid for with the funds advanced by those lenders. Obviously, if the goods were paid for with the proceeds of the loan, there would be no reclamation claim to fight about.

Judge Lifland's decision essentially jumped past the question of the good faith of the pre-petition lenders and the DIP Lenders, and held that the DIP Lending orders granted the DIP Lenders a "replacement security interest" in all of the pre-petition collateral and the proceeds thereof, further holding that "the lien chain continues unbroken." That analysis was flawed.

To begin with, for the reasons previously indicated in this Brief, we submit that any such replacement security interest granted to the DIP Lenders was subordinate to the rights of the reclamation claimants, which were entitled to adequate protection. Furthermore, in the case of the Reinz LLC, there was no pre-petition security interest, and thus none to be continued. However, even if that were not so, the decision below should still be reversed.

The decision below was based primarily upon an analysis of the differences between two pre-BAPCPA cases, *In re Dairy Mart Convenience Stores, Inc.*, 302 B.R. 128 (Bankr.S.D.N.Y. 2003)**;** and *In re Phar-Mor, Inc.*, 301 B.R. 482 (Bankr.N.D.Ohio 2003). Ultimately, Judge Lifland decided that the rationale of *Dairy Mart* was preferable

and that the facts of this case were more similar to *Dairy Mart* than to *Phar-Mor*. We submit that in so doing the decision below erred on both counts.

Regarding the decision to adopt the rationale of *Dairy Mart* instead of *Phar-Mor*, we submit that the intention of Congress in enacting the "Bankruptcy Abuse Prevention And Consumer Protection Act Of 2005" was to dissuade abuses of exactly this type. In effect, the decision below renders worthless the very reclamation rights which Congress obviously intended to expand when it changed the provisions of §546(c)(1). As a practical matter, substantially every sale of goods made to a commercial buyer for re-sale will be stripped of reclamation protection, if the decision below is allowed to stand, because substantially all of those buyers will have previously granted a UCC security interest in their "inventory". Plainly, Congress did not intend to limit the reclamation rights to sales of consumer goods, such as home sound systems and video equipment, which are typically valued at less than $1,000 and are substantially worthless once they have been reclaimed. Limiting the application of the §546 reclamation rights to consumer bankruptcies also makes no sense because it renders meaningless Congress's careful insertion of the additional protections for warehousemen that were simultaneously added by the BAPCPA to §546(i). Indeed, it seems more likely that Congress intended, by amending the statute, to supersede and override such decisions as *Dairy Mart*, which had led to the kind of bankruptcy abuses that the BAPCPA was designed to forestall.

Furthermore, *Dairy Mart* and *Phar-Mor* are both factually distinguishable from the current case. As the decision below recites, "In both *Dairy Mart* and *Phar-Mor*, pre-petition liens were satisfied from the very goods being reclaimed." (367 B.R. at 420) In

- 34 -

the current case, however, the pre-petition liens were not satisfied from the proceeds of

the goods that were reclaimed; they were satisfied from the proceeds of the DIP Loan,

which was so oversecured that it obviously would have been made regardless of whether

the reclaimed goods were included in the collateral that was furnished to the DIP Lenders

or not.  Thus, it made no difference to the DIP Lenders whether the reclamation claims

were subordinated to its rights or not, but it made a big difference to the Debtors — the

Debtors want the reclamation rights not only to be subordinated, but to be eviscerated, so

that the Debtors will get a windfall to use in their post-petition reorganization efforts.

The decision below grants them that wish — and in doing so, promotes the kind of

bankruptcy abuse the BAPCPA was intended to prohibit.

        The decision below makes a statement that "the reclaimed goods were either

liquidated in satisfaction of the Prepetition Indebtedness or pledged to the DIP Lenders

pursuant to the DIP Facility", and thus were effectively disposed of, post-petition,

defeating the reclamation rights (367 B.R. at 421).  We submit that this analysis is

fundamentally flawed, both as a matter of fact and of the basic principles of bankruptcy

law.

        As a matter of fact, there is nothing in the record to support a finding that the

reclaimed goods were liquidated or that the proceeds of them were used to pay the pre-

petition banks, and indeed the evidence is to the contrary.  As to whether those reclaimed

goods were pledged to the DIP Lenders, in violation of the reclamation claimants' rights,

the question presented is not one of fact but actually is one of law, as it is the ultimate

question which is being presented on this appeal, based on the facts which are in the

record.

As a matter of fundamental bankruptcy doctrine, it has long been required that whenever a debtor-in-possession or trustee seeks to use an asset that is already encumbered, adequate protection must be furnished which is sufficient to ensure that the creditor whose interests are to be affected will be secured by some replacement asset or other source of payment (Bankruptcy Code §§ 361-364; Bankruptcy Rule 4001; Local Bankruptcy Rule 4001-3; and General Order No. M-274). That was not done here, and the reclamation claimants were prohibited, by the reclamation procedure orders, from presenting their positions or preserving their interests in response to the DIP Lending motions — since the reclamation procedure orders set forth the exclusive method of pursuing reclamation rights, and prohibited any other attempt to voice those rights in the Bankruptcy Court. We believe that the DIP Lending orders effectively carved out and protected the rights of the reclamation claimants, as is discussed elsewhere in this Brief, but certainly if they did not, the DIP Lending orders were overreaching.

Fundamental bankruptcy doctrine also recognizes that more than one creditor might have an interest in a single asset, and that if the superior creditor receives payment without exhausting all of the collateral, the junior creditor can still get paid out of the proceeds of whatever is left. In the current case, however, this principle was also disregarded, in favor of a ruling that the reclamation claimants can only exercise their rights if the single asset reclaimed by the seller is worth more than the entirety of the senior creditor's claims, even though the senior creditor has billions of dollars worth of surplus collateral, and even though the senior creditor gets paid from sources other than

- 36 -

the proceeds of the reclaimed goods.  This is simply wrong.  Surely, whatever Congress

meant, it did not intend for debtors to be able to abuse the bankruptcy laws in such a

twisted fashion.

**Public Policy Supports Berlin's Position**

Berlin's position is further supported, not only by the plain language of the

Bankruptcy Code and the procedural rules which were made applicable in this case, but

by the public policy of our country in regard to interstate commerce and bankruptcy as a

whole.  Under Berlin's interpretation of the statute, the intention of Congress as

expressed in the BAPCPA is upheld**;** under the Debtors' interpretation, bankruptcy abuse

will continue unabated.

If this Court accepts the lower court's construction of §546, the bankruptcy of a

single company could have a chain reaction or "domino effect" under which the

bankruptcy of the purchaser leads to the bankruptcies of its suppliers, which in turn could

cause their own suppliers to file bankruptcy — and then in turn their own suppliers, and

so on up the supply chain.  A single "Enron-type" dishonest manufacturer could bring

down an entire industry, having a devastating impact on the economy.  The inherent

nature of such increased risk will inevitably work its way into the availability and pricing

of credit to countless suppliers across the nation, many of whom are often small

businesses (or at least smaller businesses than their customers who file Chapter 11).  In

addition, in anticipation of possible bankruptcies, the suppliers themselves will become

inclined to limit the credit terms under which they may be willing to sell goods to

- 37 -

prospective purchasers — perhaps drawing the line at "net 10 days" instead of "net 45 days", or even requiring "payment in advance" or "C.O.D." sales only.  Credit sales would dry up, especially to businesses whose finances are suspect.  The economy would slow.  Inflation would rise, due to increased credit costs.  Stagflation would return.

The current Chapter 11 by Dana Corporation is a fitting example of this concern. The Debtors' prepetition banks are over-secured, and thus would not be hurt at all if the reclamation claims were granted.  Nevertheless, as the Debtors' Initial Brief trumpets in the very first sentence of its "Introduction", under the Debtors' interpretation of the 2005 amendments, every one of the reclamation claims would be completely worthless.  In the circumstances, every one of the suppliers who sold goods to the Debtors on credit will be inclined to think twice before again making the mistake of selling goods on credit to another financially-suspect business.  And every one of those suppliers is itself perhaps one step closer to its own potential bankruptcy filing, if its reclamation rights are dishonored.

Thus, the interpretation of the revised reclamation rules is not simply a matter of local state law, it is a matter of public policy affecting interstate commerce throughout the country as a whole — a classic federal issue.  The Great Depression is said to have resulted not by a lack of manufacturing capacity but by a lack of credit and lending which would have enabled those facilities to be used productively — so they just sat idle.  An interpretation of the 2005 amendments which "stops the buck" at the current bankruptcy will make credit more available to suppliers nationwide.  By way of contrast, the interpretation urged by the Debtors could set back our nation's economy more than half a

century.  Surely this was not Congress's intention.

As a matter of public policy and statutory interpretation, it is submitted that the big banks and other credit providers whose loans are secured by inventory should be the ones to bear the risks inherent in their borrowers' last-minute purchases of goods on credit. Indeed, in this regard, those purchasers' banks are not really incurring any significant risks at all.  By definition, the money being advanced by the financing bank to the purchaser would not be spent by the purchaser on the last-minute purchases (because if the bank's money were used to buy the goods, there would be no reclamation claim and thus no dispute).  Similarly, the pre-petition bank could not be relying on the last-minute purchases as part of the inventory taken into account in advancing credit, since the goods would not be bought until after the financing was arranged.  If the bank wants the benefit of the inventory and of the profits that could be made by the debtor upon the sale of the last-minute purchases, the bank can see to it that the sellers of those goods get paid for them, thereby rendering the reclamation lien unnecessary and invalid, and creating an opportunity for the bank to get the benefit of any profit the debtor can obtain by re-selling the goods.

Moreover, sellers of goods have financing banks too.  Thus, a ruling on this issue in favor the sellers is not an "anti-bank" ruling; the question is only which banks will benefit and which banks will need to be more careful.  We submit that drawing the line on losses at the debtors' banks will foster more lending and better credit terms, not less.

A ruling in favor of the Debtors and their DIP lending banks on this issue would also encourage the fraudulent purchase of goods immediately prior to bankruptcy, which

is exactly the kind of conduct the 2005 amendments were enacted to discourage.  By such conduct, a devious debtor could purchase goods from unsuspecting suppliers, to whom only a corporate obligation would be created, and use the proceeds of the goods to pay off a bank loan which had been made to the corporation and personally guaranteed by the corporate officers.  Plainly, an Act whose title begins with the words "Bankruptcy Abuse Prevention" should not be interpreted in a manner which would encourage such conduct.

### CONCLUSION

Berlin's appeal should be granted, its reclamation claim should be valued at $392,077.91 (instead of zero), the Debtors' "Prior Lien Defense" should be dismissed, and the matter should be remanded to determine what portion of such $392,077.91 is recoverable from Dana Corporation and what portion is recoverable from Reinz LLC.

Dated:   Jericho, NY
         August 31, 2007

> TORRE LENTZ GAMELL GARY
>     & RITTMASTER, LLP
> *Attorneys for Berlin Metals LLC*
> *(for itself and for its assignee and*
> * transferee JPMorgan Chase Bank, N.A.)*
>
> By: /s/ Robert Beau Leonard
>         Robert Beau Leonard (RL 4010)
> 100 Jericho Quadrangle, Suite 309
> Jericho, NY 11753
> Tel.:  (516) 240-8900
> Fax:  (516) 240-8950
> email:  rleonard@tlggr.com